### The SPRAGUE CORPORATION, Millicent Monks, and Robert Monks, Plaintiffs,

v.

### Shaw SPRAGUE, Defendant.

### Civ. No. 93–283–P–C.

United States District Court, D. Maine.

June 2, 1994.

---

Michael T. Healy, Verrill & Dana and Peter L. Murray, Murray, Plumb & Murray, Portland, ME, for plaintiffs.

Robert S. Hark, Isaacson & Raymond, Lewiston, ME and Jeffrey A. Donner, Shain, Schaffer & Rafanello, Bernardsville, NJ, for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

This action arises from a land dispute in Cape Elizabeth, Maine, whereby Plaintiffs assert an interest in certain rights-of-way over Defendant's land, including the use of a road, certain paths and trails leading to the beach, and the beach. Plaintiffs advance several theories in support of their claims including easement by implication, easement by estoppel, and easement by prescription.[1] Defendant has counterclaimed, alleging that Plaintiffs recorded an affidavit in the Cumberland County Registry of Deeds for the purpose of slandering, libeling, and defaming Defendant's title.

Defendant has moved for summary judgment on all counts. This Court will grant Defendant's Motion for Summary Judgment on Count IV, alleging an easement by estoppel to the Japanese Pond Road, and on Count VII, insofar as that Count alleges easements by estoppel and by implication to the trails and beach on Defendant's land, but will deny summary judgment on Count VII with respect to the allegation of easements by prescription. This Court will otherwise deny Defendant's Motion on the remaining counts because genuine issues of material fact remain in dispute, precluding summary judgment.

Plaintiffs have moved for summary judgment on Count III, alleging an easement by implication, and on Defendant's counterclaim. This Court will grant Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim alleging libel and slander of title. The Court will deny Plaintiffs' Motion for Summary Judgment on Count III, finding genuine issues of material fact are in dispute with respect to the claim of an easement by implication to the Japanese Pond Road.

---

1. The counts in Plaintiffs' Amended Complaint are as follows: Count I requests a judgment to quiet title pursuant to section 6651 of the Maine Revised Statutes Annotated, 14 M.R.S.A. § 6651; Count II requests that the 1941 deed, in which Sprague Corporation conveyed Ram's Head to Black Point Corporation, be reformed to correct the inadvertent and mistaken omission of reserving an express right-of-way over the disputed easement; Count III alleges a quasi-easement by implication; Count IV alleges an easement by estoppel; Count V alleges an easement by prescription; Count VI alleges that Defendant trespassed by placing obstacles on Plaintiffs' right-of-way and on land owned by Sprague Corporation; Count VII alleges that Plaintiffs are entitled to a right-of-way by prescription, implication, or estoppel to hiking paths and horseback-riding trails on Defendant's land which access the beach.

## I.  UNDISPUTED FACTS

Plaintiff, the Sprague Corporation, owns a 2700–acre estate abutting the Atlantic Ocean in Cape Elizabeth, Maine known as Ram Island Farm.  Defendant's land, commonly known as "Ram's Head," consists of a thirty-acre, ocean-front plot that is surrounded on all other sides by land held by Plaintiff, Sprague Corporation.  Plaintiffs Millicent Monks and Robert Monks lease a seven-acre plot ("Lot 8") from the Sprague Corporation which lies east of, and adjacent to, Defendant's land.  They, along with the Sprague Corporation, assert easement rights to a portion of an access road that runs from the Charles E. Jordan Road—a public road traversing the Sprague Corporation estate north of Defendant's land—and connects with various other roads, accessing parts of Ram Island Farm lying to the south and the east.

The portion of the access road in dispute is referred to by the parties as the Japanese Pond Road ("JPR").  The JPR cuts into and out of Defendant's property a right angle and runs along the border of Defendant's property on both Defendant's and Sprague Corporation land.  The access road then continues back onto the Sprague estate through Lot 8, which is leased by the Monks.  The parties are contesting Plaintiffs' right to use the portion of the JPR that runs through Defendant's land.

Plaintiffs also claim easement rights to five trails that access the beach at Ram's Head as well as the right to use the beach.  Three of those trails branch off from the JPR at various intervals and lead across Ram's Head property while two additional trails lead from the property leased by the Monks and another party, the Higgins, and continue through sand dunes on Defendant's land leading to the shore.  Plaintiff Sprague Corporation's Answers to Interrogatories at ¶ 8;  Plaintiffs Monks' Answers to Interrogatories at ¶ 14 and attached map.

### A.  History of Conveyances
### of Ram's Head

Some background historical facts are necessary to place this land dispute in context and to clarify the relationship between the parties.  The Sprague Corporation was established in 1920 by Phineas W. Sprague, the father of P. Shaw Sprague and grandfather of Plaintiff Millicent Monks and Defendant Shaw Sprague.  The Corporation's mandate has been, from the beginning, to maintain the properties of the 2700–acre estate for the benefit of family descendants.  As P.W. Sprague's son, Phineas Shaw Sprague ("P.S. Sprague"), wrote:

> Neither my father nor I have ever felt that ownership in the Cape Elizabeth . . . properties should be converted into cash.  We have felt that these properties are a form of Trust or a Club to be carried on from generation to generation.

Memorandum of Intentions, Plaintiffs' Deposition Exhibit 35, (April 8, 1965).

Defendant's property, "Ram's Head," was originally part of the Sprague Corporation estate until 1941 when P.S. Sprague (father of Defendant and Plaintiff Millicent Monks) decided to sever the property from the Sprague Corporation holdings.[2]  On November 12, 1941, P.S. Sprague arranged for the Corporation to convey Ram's Head to the Black Point Corporation.[3]  The reason for the conveyance was that P.S. Sprague wanted to build a house on Ram's Head and did not want his sisters, who had a beneficial interest in ownership of Sprague Corporation stock, to have any interest in the home.  *See*

**2.** The parties dispute whether P.S. Sprague's Memorandum of Intentions refers only to the holdings of the Sprague Corporation or to the entire Ram Island Farm, including Ram's Head.

Defendant asserts that P.S. Sprague's later testamentary disposition of Ram's Head, discussed *infra*, differed from the plans and intentions expressed with respect to Sprague Corporation holdings.  *See* Defendant's Statement Controverting Plaintiffs' Statement of Uncontroverted Material Facts (Docket No. 33) at ¶ 6.

Plaintiffs assert that P.S. Sprague and the Sprague Corporation, in conveying Ram's Head, always intended that family members should continue to have access to the road, trails, and beach of that property.

**3.** The Court notes that the several corporations involved in land conveyances relevant to this action have been set up primarily to manage the land, oil, and other holdings of the Sprague family and that their boards of directors are dominated by family members.

Deposition of Robert Monks at 24; *see also* Deed from Sprague Corporation to Black Point Corporation, attached at Tab 1 to Defendant's Statement of Facts (Docket No. 25). The following year, on November 10, 1942, Black Point Corporation acquired all of the stock of Sprague Corporation and continues to function as its parent corporation. Affidavit of Robert Williamson (Docket No. 29) at ¶ 3.

Sometime after World War II, P.S. Sprague divorced his first wife, Lucy Carnegie, with whom he had had three children— Phineas, Lucy, and Millicent, who is one of the Plaintiffs in this action. At that time, he and his wife entered into an agreement whereby P.S. Sprague was to leave all of his assets in Black Point Corporation to the children of his first marriage. He later remarried and had a second family, including a son, Defendant Shaw Sprague.

In light of his agreement with his first wife, P.S. Sprague later orchestrated various transactions in order to ensure that his second family would be financially secure, with the Ram's Head property playing a pivotal role. In 1965, he undertook a large reorganization of his assets, divesting himself of all corporate holdings in Black Point Corporation. Robert Monks Deposition at 8–9 and 25 and Memorandum of Intentions. As part of that reorganization, Black Point Corporation conveyed Ram's Head on May 18, 1965, to a corporation controlled solely by P.S. Sprague, Shaw Properties—Maine. Deed from Black Point Corporation to Shaw Properties—Maine, attached at Tab 2 to Defendant's Statement of Facts; *see also* Memorandum of Intentions. Then, on July 11, 1972, Shaw Properties conveyed Ram's Head directly to P.S. Sprague. Deed from Shaw Properties—Maine to P.S. Sprague, attached at Tab 4 to Defendant's Statement of Facts. When P.S. Sprague died in 1977, his will established a trust whereby Ram's Head was occupied by his third wife, Sydney Sprague, until she remarried in early 1990. Ram's Head then passed to Defendant (who was born to P.S. Sprague and his second wife) by a Trustees' Deed of Distribution on April 19, 1990. Trustees' Deed, attached at Tab 5 to Defendant's Statement of Material Facts.

Defendant is now attempting to sell all of Ram's Head to a purchaser outside the Sprague family. Affidavit of Shaw Sprague (Docket No. 34).

### B. Deed and Lease Language Relating to Easements

The parties do not dispute that the Sprague Corporation, in conveying Ram's Head property, did not expressly reserve a right-of-way over the portion of the JPR that cuts into Defendant's land. The parties also do not dispute that the Sprague Corporation did not expressly reserve rights-of-way over trails on Defendant's property leading to the beach. One of the issues in dispute, however, is whether such rights-of-way should be implied given the wording of the deeds conveying the property and the circumstances surrounding the use of the disputed easements at the time the property was first conveyed.

In the 1941 deed that originally severed Ram's Head from the Sprague estate, the Sprague Corporation granted express easements to Black Point Corporation that include the JPR. The deed grants the owner of Ram's Head:

> the *right to use in common with others the right of way to said described lot* over the premises formerly belonging to said Charles Edwin Jordan and to use the roadway or roadways as now travelled or which may hereafter be constructed. Also the right to use the beach for the purposes of bathing, boating and fishing.

Deed from Sprague Corporation to Black Point Corporation, attached at Tab 1 to Defendant's Statement of Facts (emphasis added). This language, describing the easements granted to the owner of Ram's Head, was repeated verbatim in the deed in which Black Point Corporation conveyed the land to Shaw Properties—Maine in 1965. Deed from Black Point Corporation to Shaw Properties—Maine, attached at Tab 2 to Defendant's Statement of Facts. At the time of this conveyance, the Sprague Corporation also provided the grantee with a confirmatory deed of easements that granted the owner:

[a] perpetual right to pass and repass at all times, for all purposes, and with all manner of vehicles and equipment, across land of the Grantor situated in the Town of Cape Elizabeth, County of Cumberland and State of Maine, within the limits of the roads and ways as they now exist or as they may be hereafter relocated by the Grantor, extending from the terminus of the Town road known as the Charles E. Jordan Road over and across land of the Grantor to land this date conveyed by Black Point Corporation to the Grantee herein.

Confirmatory Deed of Easements from Sprague Corporation to Shaw Properties— Maine, attached at Tab 3 to Defendant's Statement of Facts. In the 1972 deed, Shaw Properties conveyed all of its interest in Ram's Head, including appurtenant easements, to P.S. Sprague. Deed from Shaw Properties—Maine to P.S. Sprague, attached at Tab 4 to Defendant's Statement of Facts. The parties do not make clear whether any alternative road, other than the JPR, existed and was commonly used by Sprague Corporation tenants, shareholders, and employees at the time of the 1941 conveyance to provide access to the lower reaches of Ram Island Farm. Nor do the parties clarify exactly who, other than employees of the Sprague Corporation, regularly needed access to the areas in and surrounding Lot 8 which is now leased by the Monks.

The only other written language that relates to the disputed easement is included in the 1969 lease between Plaintiff Sprague Corporation and Plaintiffs Millicent and Robert Monks. That document grants the lessee of Lot 8 an easement:

[t]ogether with the use, in common with the Landlord and others, of the existing road from the Town road through Ram Island Farm to the above described lot and the right to repair, maintain and replace the existing utility lines, poles and appurtenances.

April 1, 1969, Lease from Sprague Corporation to Robert and Millicent Monks, attached at Tab 6 to Defendant's Statement of Material Facts. At least one other road existed which provided access to the area surrounding Lot 8 when the Monks signed the 1969 lease with the Sprague Corporation. The other road, known as the Gayfield Road, also branches off from the Charles E. Jordan Town Road. In the spring, the JPR was sometimes flooded (until it was repaired in 1969) and the Gayfield Road, a seasonal field road, was often impassable in the winter and spring. Deposition of Gunter V. Gower at 9 and 15. The Gayfield Road also runs along a steep hill, while the JPR is flat and a safer route for large vehicles. Deposition of Robert Monks at 104.

### C. Nature and Frequency of Use of Easements

A second issue in dispute between the parties relates to the legal implications of the nature and frequency of Plaintiffs' use of the easements. For the sake of clarity, this Court will examine the undisputed facts with respect to Plaintiffs Monks' use of the easements, to be followed by Plaintiff Sprague Corporation's use of the easements. This discussion will further isolate facts relating to use of the JPR from facts relating to use of the trails and beach at Ram's Head. The Court notes, however, that this separation of the facts is somewhat artificial because several of the trails can only be reached by travelling on the JPR and Plaintiffs' use of the easements often overlapped.

### 1. Use of JPR by Plaintiffs Millicent and Robert Monks

Millicent Monks, who was born in 1933, states that her earliest memory of using the JPR was of riding on her father's shoulders at the age of four, as they made their way down the road through the snow. Deposition of Millicent Monks at 8. Following the 1941 conveyance, she lived on Ram's Head with her father, P.S. Sprague, and family during the summer months when they all used the road regularly. *Id.* at 8–9. Millicent Monks states that she has used the JPR continuously from 1941 until 1993. *Id.* at 55–58. Millicent Monks also states that she always felt welcome at her father's house. *Id.* at 57.

Millicent married Robert Monks in 1954, and the couple resided at the Strawberry Hill House on Ram Island Farm, adjacent to Lot

8, for the summer of 1954 or 1955. They have been living on Lot 8, at what was formerly designated as the Richmond house, but at what the parties now call the Monks' house, during summers and weekends up to the present. Deposition of Millicent Monks at 8–10; Deposition of Robert Monks at 20 (indicates that Robert Monks also lived at Monks House for an entire seven-year period, from 1970–1977).

Millicent Monks states that she and her husband have continuously used the access road, which includes the disputed JPR, to reach their property at least since the summer of 1954, 1955, or 1956. She states that she has also used the road regularly for walking, horseback riding, visiting sisters, going to the beach for picnics held by her father, and going to Sprague Corporation offices. Deposition of Millicent Monks at 56–58 & 151.

From the date of the Monks' 1969 lease until 1983, they expended more than 15,000 dollars to improve the access road that includes the JPR. Letter dated August 31, 1977, from Millicent Monks to Sprague Corporation President, attached at Tab 10 to Defendant's Statement of Material Facts; Plaintiffs Millicent and Robert Monks' Answers to Interrogatories at ¶ 3. The Monks' use of the road was interrupted intermittently between 1975 and September of 1977 when P.S. Sprague erected barriers on various occasions over a two-year period, obstructing use of the portion of the JPR that cuts through Ram's Head.[4] Deposition of Robert Monks at 19; Deposition of Millicent Monks at 28, 34–37; Letters from Millicent Monks to President of the Sprague Corporation dated February 15, 1977, and August 31, 1977,

attached at Tab 10 to Defendant's Statement of Material Facts.

Once the road was blocked, Millicent Monks and her husband began using the Gayfield road to access their property. Deposition of Millicent Monks at 37. Millicent Monks continued to walk on the JPR road on occasion, even when it was barricaded, to go to her father's house on Ram's Head. *Id.* at 57. Because of problems encountered in using the Gayfield Road relating to climate and steepness, in addition to the obstacles placed on the JPR access route, Plaintiffs Robert and Millicent Monks financed the construction of another access road that was built during 1981 and 1982 and runs from Route 77 to their leased premises.[5] Deposition of Millicent Monks at 40.

The Monks have continued to use the JPR on occasion through the 1980s and up to 1993 when Defendant erected barriers blocking access. *Id.* at 48–50.

### 2. Plaintiffs Monks' Use of Trails and Beach

The Monks are also claiming easements along the beach of Ram's Head and to three trails leading to the beach. Millicent Monks states that she has been using these easements her entire life for horseback riding, walking, meeting friends and swimming with family. Deposition of Millicent Monks at 151; Plaintiffs' Millicent and Robert Monks' Answers to Interrogatories at ¶ 13. During the summer months, beginning in 1954, '55, or '56 when the Monks established their own household on Ram's Head, they state that they have used the beach and trails for walks, swimming, and horseback riding. During weekends in the winters, the ease-

---

4. When P.S. Sprague died in 1977, the barriers blocking the JPR were removed by his widow, Sydney Sprague. She later had the road posted with a notice to prevent acquisition of an easement; had the Monks served with a similar notice in 1985; and caused the notice to be recorded in the Cumberland County Registry of Deeds pursuant to title 14 section 812 of Maine's Revised Statutes Annotated. *See* 14 M.R.S.A. § 812; Defendant's Memorandum in Support of Motion for Summary Judgement (Docket No. 24) at 4–5; Notice to prevent Acquisition of a Right of Way (August 19, 1985), attached at Tab 12 to Defendant's Statement of Material Facts.

5. One limitation to use of the Monks' Road is that a bridge on the road has a weight limit preventing usage by heavy vehicles which must still approach from one of the other two access roads, with the JPR being the preferred route because of its flat grade. Deposition of Robert Monks at 74–75 and 104; Deposition of Millicent Monks at 40.

The Monks state that use of the JPR route is still important to their enjoyment of their leased land because they often approach Ram Island Farm from the west, with the JPR providing the most direct access to lot 8. Deposition of Robert Monks at 76.

ments have been used less frequently for walks and horseback riding. *Id.* The Monks contend that they have been using these easements continually until June or July of 1993 when Defendant erected barriers blocking access to the trails and beach.[6] Deposition of Gunter Gower at 57–58; Deposition of Millicent Monks at 49–50; Plaintiffs Monks' Answers to Interrogatories at ¶ 13.

### 3. Use of JPR by Plaintiff Sprague Corporation

Plaintiff Sprague Corporation has presented undisputed facts that the JPR has been in use by its employees and shareholders since at least 1929. Linwood Dunham has lived and worked year-round on Ram Island Farm from 1929 until 1971. He states that at various times from 1929 until 1951, during his employment as an orchardist, he and a work crew of about twenty people would use the road to spray apple trees and transport apples, to build log cabins and cottages, to walk cattle, and to cut firewood. Affidavit of Linwood Dunham at ¶¶ 3, 10, 11, 12, 13 and 14. Dunham also states that he observed P.W. Sprague (Plaintiff Millicent Monks' and Defendant's grandfather) using the road daily to drive around Ram Island Farm during the summer months. *Id.* at 9. Dunham continued to use the JPR regularly as part of his employment when he worked at the riding stables from 1951 until 1971, leading trail rides for Sprague family members and Sprague Corporation tenants along the road. *Id.* at 15. Dunham's daughter, Marjorie Dunham, was born on Ram Island Farm in 1934 and states that she used the JPR for as long as she can remember. Affidavit of Marjorie Dunham at ¶ 3. Dunham states that she used the JPR to lead trail rides for tenants and family members as part of her employment from 1952 until 1956 and continued to use the road as a tenant from 1956 until 1971. She also states that she often saw other tenants of the Sprague Corporation and members of the Sprague family using the right-of-way as well. Affidavit of

Marjorie Dunham at ¶¶ 2, 6–8. A carpenter who worked on Ram Island Farm from 1968 until 1983 stated that he would most frequently use the JPR, but sometimes drive on the Gayfield Road, to access various parts of the estate to build and repair cottages and to maintain roadways. Deposition of Gunter V. Gower at 9 and 15.

Ellen Higgins is a tenant of Sprague Corporation who has been renting the Copeland Cottage, located on the Monks' leased land, from 1963 until the present. In 1971, she began living full-time at Copeland Cottage. She states that she used the JPR regularly to travel from the public road to her cottage from 1963 until 1975 when the road was blocked by P.S. Sprague. She states that she continued to walk on the JPR to retrieve her mail after 1975, until her mailbox was moved to the Monks' new road in 1982. Affidavit of Ellen Higgins.

Family member Phineas Sprague is a son of P. Shaw Sprague from his first marriage and a stockholder of Black Point Corporation. He states that he used the JPR since early childhood in the 1930s and has continued to use it from 1947 until the present with his wife, Mary Lou Sprague, and his children on weekends during the winter and during summer visits.

Family member John Abbott Sprague, who is a grandchild of P.S. Sprague and President of Sprague Corporation, remembers using the JPR beginning in the late 1950s when he spent Thanksgiving and Christmas at Ram's Head and during summer visits to the farm when he went on hay rides, horseback riding, bicycle riding, apple picking, and picnicking. Deposition of John Abbott Sprague at 7–9.

Sprague Corporation also points to affidavits of employees, tenants, and a shareholder/family member indicating that it has continuously maintained the JPR access road and plowed it during winters at least until the road was blocked by P.S. Sprague in 1975. *See* Affidavits of Phineas Sprague at

---

**6.** The frequency of use is in dispute, with Defendant pointing to deposition testimony of Gunter Gower who worked in maintenance on Ram's Head from 1983 until the present. Although Gower states that he never patrolled the beach

during this time, he would occasionally be in a position to observe who was using it. Gower indicated that "Millie and Bob Monks, I might see once a year on the beach." Deposition of Gunter Gower at 55.

¶ 6, Phyllis Emery at ¶ 5, Ellen Higgins at 6, Linwood Dunham at ¶¶ 13 and 15.

### 4. Plaintiff Sprague Corporation's Use of Beach and Trails

Sprague Corporation employee Linwood Dunham ran the riding stable on Ram Island Farm from 1951 until 1971. As part of his employment, he kept the bridle paths clear throughout the estate, including the disputed trails that access the beach on Ram's Head, for the use of "members of the Sprague family and tenants, guests, and employees of the Sprague Corporation." Affidavit of Linwood Dunham at ¶ 15. Dunham states that he personally used the trails that access the beach at Ram's Head, as well as the beach, every day for riding. *Id.* He also observed members of the Sprague family and tenants of the Sprague Corporation using the trails and beach regularly during the summer. *Id.*

His daughter, Marjorie Dunham, who was born on Ram Island Farm in 1934, states that she used the paths accessing the beach at Ram's Head and the beach for as long as she can remember. Affidavit of Marjorie Dunham at ¶ 3. Dunham worked at the stables from 1952 until 1956 and states that she used the trails accessing the beach at Ram's Head and the beach about twice a day when she took summer tenants of the Sprague Corporation on trail rides. *Id.* at ¶¶ 6–7. From 1956 until 1971, Dunham says she continued to use the trails and the beach several times a week and states that she frequently saw tenants of the Sprague Corporation and members of the Sprague family using the rights-of-way as well. *Id.* at ¶ 8.

Sprague Corporation tenant Ellen Higgins states that she has walked along the trails accessing the beach at Ram's Head and used the beach since she first began renting the Copeland Cottage in 1963 up to the present time. Affidavit of Ellen Higgins at ¶ 8. Gunter Gower, who is currently employed by Defendant to do maintenance on Ram's Head, has stated that he has seen Ellen Higgins and her husband using the beach on occasion and that he believes they continued to use the beach, on at least one occasion, after Defendant put up a fence barring access in June or July of 1993. Deposition of Gunter Gower at 56 and 59. Gower has also stated that during the ten years that he has worked on Ram's Head, he has seen Sprague Corporation family members and tenants riding horses and walking down several paths that access the beach through Defendant's property. *Id.* at 52–56.

Phineas Sprague states that he has used the trails and beach at Ram's Head beginning in the 1930's for walking, horseback riding, and swimming. Affidavit of Phineas Sprague at ¶ 3. Beginning in 1947, he, his wife, Mary Lou Sprague, and their children have used the trails and beach at Ram's Head up to the present time. *Id.* at ¶ 8.

John Abbott Sprague remembers using the beaches and horseback riding trails during family visits to Ram Island Farm beginning in the late 1950s. Deposition of J. Abbott Sprague at 7–9.

## II. DISCUSSION

### A. Count III—Easement by Implication [7]

Both Defendant and Plaintiffs have moved for summary judgment on Count III, alleging that Plaintiffs possess an easement by implication with respect to the JPR. This Court will deny both motions, finding that genuine issues of material fact are in dispute which preclude summary judgment as a matter of law. Fed.R.Civ.P. 56(c).

■ Under Maine law, an implied easement may be created when:

> a common grantor severs real estate, conveying part of it and retaining the balance (or conveying it to a third person), and the circumstances at the time of the conveyance denote the grantor's intent to subject the retained land (the servient estate) to

**7.** The Court, having found that a number of counts in Plaintiffs' Complaint survive Defendant's Motion for Summary Judgment, need not discuss Count I, asserting a complaint to quiet title; Count II, asserting a complaint to reform the 1941 deed; and Count VI, asserting trespass

by Defendant over Plaintiff's rights-of-way. At this point, it is premature to assess these counts until final determination of other counts in the Complaint as to whether Plaintiffs are entitled to easements by implication or prescription over Defendant's land.

an easement benefitting the conveyed land (the dominant estate).

*Frederick v. Consolidated Waste Services, Inc.,* 573 A.2d 387, 389 (Me.1990) (citing *Bowers v. Andrews,* 557 A.2d 606, 608 (Me.1989); *O'Connell v. Larkin,* 532 A.2d 1039, 1042 (Me.1987); and *Brown v. Dickey,* 106 Me. 97, 101, 75 A. 382 (1909)). Defendant's central argument in support of his summary judgment motion is essentially a legal one, pointing out that almost every applicable precedent in Maine law relates to the grantor's intent to subject his retained land to an easement benefitting the conveyed land and not to the reverse situation of intent to subject the conveyed land to an easement benefitting the grantor's estate. This argument is unavailing given *Le May v. Anderson,* 397 A.2d 984, 987 (Me.1979), and *Robinson v. Maine C. R. Co.,* 623 A.2d 626, 627 (Me. 1993), both of which have recognized that "[a]n easement over conveyed property, although not expressly reserved, may nevertheless be impliedly created in favor of the grantor of the servient estate. . . ."

After a careful reading of the above cases, this Court determines that the Law Court has not restricted, to very narrow fact patterns, the situations in which easements by implication over conveyed property can be found, as Defendant attempts to argue. Hence, the Court now properly focuses on whether the parties have presented enough facts to generate genuine issues of material fact to survive these summary judgment motions.

■ To determine whether a grantor, in this case the Sprague Corporation, impliedly reserved an easement at the point where the JPR crosses into and out of the property known as Ram's Head, the Court must focus upon the probable intent of the parties. *Le May,* 397 A.2d at 987–88. The Court should look to " 'all the circumstances of the case' from which that intent may be inferred." *Bowers,* 557 A.2d at 608 (citation omitted). Both Defendant and Plaintiffs point to the Memorandum of Intentions written by P.S. Sprague but cite the Memorandum in support of different propositions. Memorandum of Intentions, Plaintiffs' Deposition Exhibit 35 (April 8, 1965). At the time of the 1941

conveyance, P.S. Sprague was both Director and President of the Sprague Corporation and Director and Treasurer of the Black Point Corporation. Defendant's Response to Request for Admissions at ¶ 8. Plaintiffs argue that the Memorandum reflects P.S. Sprague's intent that all actions taken by the Sprague Corporation—including the 1941 conveyance—be in furtherance of the Sprague Corporation's sole purpose of maintaining Ram Island Farm for the benefit and enjoyment of Sprague descendants. Defendant, on the other hand, notes that P.S. Sprague never mentioned Ram's Head specifically in his Memorandum of Intentions and argues that P.S. Sprague had a different intention with respect to the disposition of Ram's Head when he severed the property from the Sprague Corporation estate. Defendant points to the failure of the Sprague Corporation to reserve an easement over Ram's Head as further evidence of the parties' intent that the property be separated from the plans and uses of the Corporation's property. Defendant's Statement Controverting Plaintiffs' Statement of Uncontroverted Material Facts (Docket No. 33) at ¶ 6. These disputed facts with respect to P.S. Sprague's overall intention in severing Ram's Head from the Sprague estate preclude this Court's entry of summary judgment for either party.

■ Plaintiffs further direct the Court's attention to a number of facts regarding the necessity of use of the JPR at the time of the 1941 conveyance. As a legal matter, necessity of the continued use of the prior "quasi-easement" is significant only to the extent that it "bears on whether it is reasonable to infer that the parties to the conveyance had regarded the continuation of the use" as obvious. *Bowers,* 557 A.2d at 609. Plaintiffs point specifically to deposition testimony of Linwood Dunham indicating that the JPR was used continuously by employees for many years prior to and up to the 1941 conveyance; and that P.W. Sprague, founder of the Sprague Corporation, used the road to access portions of the estate surrounding Lot 8 during his annual summer residences on the farm. Plaintiffs also point to facts that arguably indicate that the JPR was the most

reliable access route to the remainder of the Sprague estate around the time of the conveyance (*see* Affidavit of Phyllis Emery at ¶¶ 3–4; Deposition of Gunter Gower at 9 and 15).

Plaintiffs base their argument as well on the somewhat ambiguous wording of the 1941 deed, describing an easement conveyed to the owner of Ram's Head as:

the right to use in common with others the right of way to said described lot over the premises formerly belonging to said Charles Edwin Jordan and to use the roadway or roadways as now travelled or which may hereafter be constructed.

Deed from Sprague Corporation to Black Point Corporation, attached at Tab 1 to Defendant's Statement of Facts (Docket No. 25). Plaintiffs further point to the location of the JPR—*i.e.,* the manner in which the road marks the boundary between Sprague Corporation land and Ram's Head, only intersecting for a short distance on Defendant's land. Plaintiffs argue that all of the above-cited facts support the proposition that the parties to the conveyance regarded continuation of use of the JPR as so obvious that it would "go without saying." *Bowers,* 557 A.2d at 609.

Following the conveyance, Plaintiffs point to additional facts indicating that employees of the Sprague Corporation, tenants, and family members continued to use the JPR as the primary access route to much of Ram Island Farm. *See, e.g.,* Depositions of employees Linwood Dunham, Marjorie Dunham, Phyllis Emery; Depositions and Affidavits of family members Millicent Monks, Robert Monks, and Phineas Sprague.

Defendant disputes these facts, regarding the necessity and regularity of use of the JPR, insomuch as he alleges that "the Grantor's retained land had miles of road . . . and an internal roadway system." Defendant's

Response to Plaintiffs' Motion for Summary Judgement (Docket No. 32) at 5. Defendant is not specific as to which roads he refers and whether such roads were used with as much frequency as the JPR or provided Plaintiffs with equally reliable access to the remainder of the farm. This Court finds, however, that genuine issues of material facts are in dispute with respect to the necessity of continued use of the JPR at the time of conveyance which preclude summary judgment.[8]

### B. Count IV—Easement by Estoppel

Defendant has moved for summary judgment on Count IV. It is undisputed by Defendant that Plaintiffs Millicent and Robert Monks expended about $15,000 in improvements to the JPR. It is also undisputed that the Sprague Corporation maintained the JPR access road and plowed it during winters.[9] Plaintiffs assert a type of estoppel theory, arguing that owners of Ram's Head have benefitted from Plaintiffs' maintenance of, and improvements to, the JPR and should, therefore, be estopped from denying the existence of an easement. Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Docket No. 30) at 15.

■ Defendant argues, and this Court agrees, that Maine courts have recognized only a limited theory of easements by estoppel which arise by implication when a grantor conveys land that is described as being bounded by a street or road. Under this theory, grantees who purchased land, in reliance upon a reasonable belief that they were entitled to use the easements shown on the grantor's plan, will be found to possess an easement by estoppel. *See, e.g., Brown v. Dickey,* 106 Me. 97, 101–02, 75 A. 382 (1909); *Arnold v. Boulay,* 147 Me. 116, 120, 83 A.2d 574, 576 (1951).

---

8. As noted in the Undisputed Facts section, the parties do not make clear whether any alternative road, other than the JPR, existed and was commonly used by Sprague Corporation tenants, shareholders, and employees at the time of the 1941 conveyance to provide access to the lower reaches of Ram Island Farm. Nor do the parties clarify exactly who, other than employees of the Sprague Corporation, regularly needed access to

the areas in and surrounding Lot 8 which is now leased by the Monks.

9. These facts are also relevant to Count III, alleging an easement by implication, and Count V, alleging easement by prescription, as they relate to the intent of the parties in treating the easement as their own.

■ Other jurisdictions that have recognized the theory of easement by estoppel put forward by Plaintiffs have required a showing (1) of a representation communicated to the promisee; (2) that the representation was believed; and (3) that there was reliance upon such communication. Reliance can be shown by an expenditure on the easement. *See, e.g., Exxon Corp. v. Schutzmaier,* 537 S.W.2d 282 (Tex.Civ.App.1976). Here, Plaintiffs point to no facts indicating that owners of Ram's Head made a representation to the Sprague Corporation regarding its rights to use an easement over the JPR. Finding no genuine issue of material fact in dispute, this Court will grant Defendant's Motion on Count IV as a matter of law because Plaintiffs fail to point to sufficient facts to support their claim.

### C. Count V—Easement by Prescription

Defendant has moved for summary judgment on Count V, alleging that Plaintiffs have acquired an easement by prescription to the JPR where it crosses into and out of Defendant's land. Finding genuine issues of material fact in dispute, this Court will deny Defendant's Motion.

■ Under Maine law, an easement by prescription is established if a party can show:

> continuous use for at least twenty years under a claim of right adverse to the owner, with his knowledge and acquiescence, or by a use so open, notorious, visible and uninterrupted that knowledge and acquiescence will be presumed.

*Jost v. Resta,* 536 A.2d 1113, 1114 (Me.1988) (quoting *Dartnell v. Bidwell,* 115 Me. 227, 230, 98 A. 743, 744 (1916)). Defendant first argues that Plaintiff Sprague Corporation cannot, as a matter of law, satisfy the requirement of "claim of right adverse to the owner" where Plaintiff was the wholly-owned subsidiary of Black Point Corporation during its ownership of Ram's Head from 1941 until

1965. Defendant further argues that Plaintiff, being unable to satisfy the requirement of adversity until 1965, is similarly unable to show continuous use for a twenty-year period because P.S. Sprague blocked the JPR from 1975 until 1977 while his widow, Sydney Sprague, posted and served notices in 1985, preventing the acquisition of an easement by prescription. *See* 14 M.R.S.A. § 812.

■ Defendant cites no Maine cases, and this Court has been unable to find any, to support the proposition that a wholly-owned subsidiary cannot acquire an easement by prescription as against its parent corporation. The only case Defendant cites is a New York state court case, *Casa Del Mar Club Holding Co. v. Town Board of Hempstead,* 124 N.Y.S.2d 731, 735 (Sup.Ct. 1953). That case merely holds, however, that in the absence of proof that use by a subsidiary corporation was not with consent of the parent corporation, the court will presume that the parent corporation *acquiesced* in the use and that the use was not *hostile.* Maine law, unlike New York law, does not require the element of hostile use to support a claim to a prescriptive easement but, rather, requires the lesser showing of acquiescence. The case cited by Defendant, then, actually supports Plaintiffs' claim that their continued use of the JPR was with the acquiescence of the parent corporation.[10]

Defendant argues further that Plaintiffs fail to satisfy the requirement of adversity because they are asking the Court "to elevate the visit of a child or grandchild to his or her father's or grandfather's house to the status of a hostile or adverse use under a claim of right." Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law (Docket No. 24) at 15. Defendant goes on to argue that Plaintiffs' use of the easement could well be permissive by pointing out that Plaintiff Millicent Monks stated in deposition testimony that she was always welcome at her father's house. Deposition of Millicent Monks at 57. Deposition

---

10. Other facts in this case indicate that where corporations are closely held by family members, the actions of a parent corporation can well be sparked by adversity to other family members with holdings in the subsidiary corporation. As Plaintiffs allege, P.S. Sprague engineered the 1941 conveyance of Ram's Head from the Sprague Corporation to Black Point Corporation in order to divest his sisters, who held a beneficial interest in stock in Sprague Corporation, of any interest in the house that he planned to build on Ram's Head.

and affidavit testimony of some witnesses apparently falls into the category of permissive use of the easement, as asserted by Defendant; *i.e.*, where Ram's Head was used solely in connection with family visits authorized by P.S. Sprague. *See, e.g.*, Deposition of J. Abbott Sprague and, perhaps, Affidavit of Phineas Sprague.

In making this argument, however, Defendant ignores the deposition testimony and affidavits of Sprague Corporation employees and tenants unrelated to the Sprague family (*see, e.g.*, Depositions of Gunter Gower and Linwood Dunham; Affidavits of Marjorie Dunham, Phyllis Emery, and Ellen Higgins). Defendant also ignores testimony by Plaintiffs Monks, other family members, and the Sprague Corporation who used the JPR regularly to access summer cottages and riding trails. Plaintiffs specifically state that they viewed their use of the road as stemming from an entitlement to use all of Ram's Island Farm as Sprague family descendants; an entitlement that was independent of any claim of right to use Ram's Head property based on ownership of the property by Millicent Monks' father, P.S. Sprague, either individually or through Shaw Properties—Maine and Black Point Corporation. *See*, Plaintiff Sprague Corporation's Answers to Interrogatories at ¶ 4 (indicating that the "corporate purpose of such use of the Japanese Pond Road ... has been to own, control and use the property in a manner consistent with the original intentions of P. Shaw Sprague and P.W. Sprague"); Plaintiffs' Millicent and Robert Monks' Answers to Interrogatories at ¶ 15 ("We have always understood that the roads ... of the entire Ram Island Farm, including the so-called Rams Head parcel, are for the use and enjoyment of the entire Sprague Family under the auspices of the Sprague Corporation").[11]

■ Beyond Defendant's arguments, the Court finds that genuine issues of material fact are in dispute with respect to the character and period of continuity of use of the JPR. As a threshold matter, this Court notes that evidence regarding use of the JPR by Sprague Corporation shareholders and employees may, as a legal matter, be viewed as inuring to the benefit of the Sprague Corporation. The Court further notes, however, that Plaintiffs Millicent and Robert Monks, who have a tenancy for years, do not have standing to assert a claim to a prescriptive easement and that the owner of the fee simple estate—in this case, the Sprague Corporation—is the only party entitled to make such a claim. *See* 25 Am.Jur.2d Easements and Licenses § 4 (1966) ("One in possession of land as a tenant at will or for years cannot acquire for himself by prescription an easement of way over the lands of another. However, adverse use of an easement over the land of a third person by a tenant under his lease inures to the benefit of the landlord so as to support the landlord's right to such easement by prescription.")

Plaintiffs' Monks have presented their lease to the Court which indicates that they have used the JPR, at least since 1969, under lease provisions authorizing such use by the Sprague Corporation. Facts are in dispute with respect to whether the Monks had a lease prior to 1969 or whether there are additional facts supporting some other relationship that would allow Plaintiffs to tack the time and nature of their usage of the easement onto that of the Sprague Corporation. Also left unclear is whether tenant Ellen Higgins, who testifies to use of the JPR since 1963, made use of the access road under provisions of a lease implicitly or explicitly authorizing such use by the Sprague Corporation.

Even if Plaintiffs Monks had an earlier lease authorizing their use of the JPR, facts still remain in dispute as to the exact year that Plaintiffs began spending summers on Ram Island Farm and using the JPR in an adverse fashion. Testimony by Plaintiff Mil-

---

11. In *Burnham v. Burnham*, 130 Me. 409, 156 A. 823 (1931), the Maine Law Court stated that family relationship between opposing parties in a claim to a prescriptive easement is not conclusive but could be viewed as evidence in determining the character of the use of the easement and whether such use was adverse. The Court went on to find that a son established an independent claim of right to a prescriptive easement to land held by his father where the son said that "he exercised this right because his predecessors in title had done so before him, and not because of any consent from his parent." *Burnham*, 130 Me. at 412, 156 A. 823.

licent Monks as to her use of the JPR while living with her father at Ram's Head during the 1940s are not sufficient to substantiate a claim of adversity under an independent claim of right.

### D. Count VII—Beach Use and Access

Defendant has moved for summary judgment on Count VII, wherein Plaintiffs assert easements by implication, prescription, or estoppel to five riding trails accessing the beach as well as the beach at Ram's Head. This Court will grant Defendant's Motion for Summary Judgment on Count VII, insofar as it relates to a claim of easements by estoppel, based on the same reasoning used by the Court in granting Defendant's Motion for Summary Judgment on Count IV, alleging an easement by estoppel to the use of the JPR. *See* page 433 *supra*.

■ This Court will also grant Defendant's Motion for Summary Judgment on Count VII insofar as it relates to a claim of easements by implication. Unlike the wealth of circumstantial evidence pointed to by Plaintiffs in support of the parties' intent to maintain an easement by implication over the JPR (*see* pages 431–433 *supra* ), Plaintiffs point to little, if any, evidence supporting their claim of an easement by implication over the beach and trails accessing the beach at Ram's Head. The only evidence indicating that the beach was used at the time of the 1941 conveyance by parties other than members of P.S. Sprague's immediate family who lived on Ram's Head is an affidavit submitted by Linwood Dunham, who worked for the Sprague Corporation. Dunham states that employees would walk cows across the beach at Ram's Head to reach the cow pasture located on what is now referred to as the Monk's premises. Affidavit of Linwood Dunham at ¶ 14. The affidavit does not specify the time period that such use occurred, whether it occurred during the period of the conveyance, the frequency of such use, or the importance of the beach as opposed to other routes for accessing the cow pasture.

Another affidavit submitted by employee Phyllis Emery indicates that the beach and trails at Ram's Head exist in substantially the same location today as they were in 1932. Affidavit of Phyllis Emery at ¶ 3. Plaintiffs otherwise submit no additional evidence to shed light on the use of the easements at the time of conveyance or to support any inference that the parties intended that the Sprague Corporation, its employees, and tenants be entitled to use of the trails to the beach and the beach itself at the time of the 1941 conveyance.

This Court will deny Defendant's Motion for Summary Judgment on Count VII insofar as it alleges easements by prescription over trails and the beach at Ram's Head. Defendant makes the same arguments against prescription that he raised in his motion seeking summary judgment on Count V with respect to easement by prescription to the JPR. Defendant asserts that Plaintiffs attempt to elevate family visits to the level of legally significant acts. However, Defendant ignores the evidence submitted by Plaintiffs of use of the trails and beach by Plaintiffs Monks, Sprague Corporation employees Linwood and Marjorie Dunham, Sprague Corporation tenant Ellen Higgins, and others. The above-named parties who used the trails and beach for horseback riding, walking, and swimming allege that their use has taken place continuously under a claim of right derived from the Sprague Corporation and not from the owners of Ram's Head. Plaintiff has documented such uses at least since 1951 (*see* Affidavit of Linwood Dunham), and it is undisputed that such use occurred up until 1993 when Defendant blocked the trails and beach.

There are still genuine issues of fact in dispute with respect to the character and frequency of use of the trails and beach, however. The Court needs to examine whether the use of the trails and beach by Sprague Corporation tenants occurred under the implied or express provisions of a lease with the Corporation, in order to determine whether use by tenants can inure to the benefit of the Corporation. The Court also needs to determine the frequency with which the trails and beach were used by employees, family members, and tenants, and at what point in time such uses, particularly by fami-

ly members, became adverse to the claim of right of the Ram's Head owner.

### E. Counterclaim—Libel and Slander of Title

■ Plaintiffs have moved for summary judgment on Defendant's Counterclaim, alleging that the Sprague Corporation recorded an affidavit in the Cumberland County Registry of Deeds regarding its claimed easements in the Ram's Head property for the purpose of slandering, libeling, and defaming Defendant's title. Answer and Counterclaim by Defendant (Docket No. 1A). The affidavit in question was filed by John Abbott Sprague, President of the Sprague Corporation, and asserted that shareholders, tenants, and guests of the Sprague Corporation have continuously used the JPR for more than twenty years prior to and after the 1941 conveyance. The affidavit continues, stating "from the time of the 1941 deed and continuously since, the Sprague Corporation, its tenants, shareholders and guests have continued to utilize such road as it was utilized prior to the 1941 deed."

The affidavit further asserts that the Sprague Corporation, its tenants, shareholders, and guests have continuously used, for twenty years prior to 1941 and up to the date of the affidavit, various rights-of-way and the beach on Ram's Head. J. Abbott Sprague Affidavit Re: Shaw Sprague Real Estate, Plaintiffs' Deposition Exhibit 42 (Sept. 2, 1993).

In an action for slander of title, a counterclaim "plaintiff must show that there has been a *malicious publication* of *false allegations* concerning the title to his property causing *special damages.*" *Markowitz v. Republic National Bank,* 651 F.2d 825, 828 (2d Cir.1981) (emphasis added).

Plaintiffs assert the qualified privilege of a "rival claimant" which refers to a situation in which two parties claim one or more of the same legally protected interests in land, chattels, or intangible things. Restatement (Second) of Torts § 647 (1977) and comment c. Such a privilege would require Defendant to show that Plaintiffs did not have a good-faith belief in the "possible validity of [their] claim," Restatement (Second) of Torts § 647

comment d (1977), but rather acted in knowing or reckless disregard of the truth, *id.,* § 623A. *See also Fischer v. Bar Harbor Banking & Trust Co.,* 673 F.Supp. 622, 625–27 (D.Me.1987), *aff'd* 857 F.2d 4 (1st Cir. 1988), *cert. denied,* 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989).

■ The Court need not reach this issue because, even without the privilege, Defendant has failed to point to facts indicating that the allegations in the affidavit are false. Defendant asserts in his Counterclaim that the affidavit falsely alleges continuous and uninterrupted use of the rights-of-way. Defendant's Counterclaim at ¶ 5. The affidavit, however, does not characterize use of the JPR as "uninterrupted." In addition, Plaintiffs have presented deposition testimony of Millicent Monks indicating that she continued to use the JPR during the time that her father blockaded the road. Deposition of Millicent Monks at 57. Defendant also fails to point to facts indicating that the affidavit's assertion of continuous use of the trails and beach from 1941 until 1993 are false. While Defendant argues that the affiant, J. Abbott Sprague, is too young to testify to use of the easements prior to 1941, the Sprague Corporation has presented multiple affidavits and depositions indicating that such use did in fact take place and that Sprague indicated he relied on information provided by these parties in compiling the affidavit. Deposition of J. Abbott Sprague at 12–13.

Defendant also fails to satisfy the requirement of showing special damages. He asserts that the affidavit may hinder him from successfully completing a sale of the property but goes on to state that "[if] the transaction is closed as contemplated, it is possible that there will be no realization of damages and that the trial of the damage issues relating to the Counterclaim may become unnecessary." Defendant Shaw Sprague's Objections to Plaintiffs' Motion for Summary Judgement (Docket No. 32) at 10. Such an assertion of hypothetical damages is insufficient to withstand Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim. Finding no genuine issues of material fact in dispute on this Counterclaim, the Court will grant

438

Plaintiffs' Motion for Summary Judgment as a matter of law.

### F. Relocation Agreement

█ As a final note, the Court would like to make clear its view that the Relocation Agreement cited by Defendant does not have real bearing on the issues in this case. That agreement, entered into between Defendant and the Sprague Corporation in 1992, allowed Defendant to alter the location of the access road on Sprague Corporation land as it leads to his property. The access road, according to the agreement, would still enter Ram's Head at the same point, and there is no indication in the agreement that the Sprague Corporation agreed to the termination of the JPR as it traverses through Defendant's property. As a Sprague Corporation board member later wrote to Defendant, "you already had an easement through the Farm entrance and the relocation of that easement was simply a restatement of an existing right. By granting a relocation of the existing easement the Board was not giving up any legal right to the detriment of its Shareholders...." October 30, 1992 letter to Shaw Sprague from Whit Foster, Plaintiffs' Deposition Exhibit 61. Hence, the Corporation did not relinquish any rights to the easement by virtue of that agreement.

Accordingly, it is *ORDERED* that Defendant's Motion for Summary Judgment on Count IV, alleging an easement to the JPR by estoppel, be, and it is hereby, *GRANTED.* It is *FURTHER ORDERED* that Defendant's Motion for Summary Judgment on Count VII, insofar as that count alleges easements by estoppel and by implication to the trails and beach at Ram's Head, be, and it is hereby, *GRANTED.* It is also *ORDERED* that Plaintiffs' Motion for Summary Judgment on Defendant's Counterclaim, alleging slander of title, be, and it is hereby, *GRANTED.* On all other counts, it is *ORDERED* that Defendant's and Plaintiffs' Motions for Summary Judgment be, and they are hereby, *DENIED.*

So *ORDERED.*